UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
HECTOR GARCIA ORTIZ,                 :           15cv2206(DLC)
                                     :
                    Plaintiff,       :           OPINION AND ORDER
        -v-                          :
                                     :
THE CITY OF NEW YORK, POLICE OFFICER :
EDWIN VAZQUEZ, AND POLICE OFFICER    :
STEPHANIE HANNA,                     :
                                     :
                    Defendants.      :
                                     :
------------------------------------ X

APPEARANCES

For the plaintiff:
Cory T. Lee
C. T. Lee & Associates
225 Broadway, Suite 3005
New York, NY 10007

Ameer N. Benno
Benno & Associates, P.C.
110 Wall Street, 11th Floor
New York, NY 10005

For the defendants:
Melanie Speight
The City of New York Law Department
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

     The parties seek guidance in advance of this 42 U.S.C. §

1983 trial on the extent to which medical records reflecting the

plaintiff's hospitalization for intoxication will be admissible.

It is undisputed that on June 1, 2014 -- the date of the

incident at issue -- the defendant police officers had the plaintiff taken by ambulance to a hospital and that the hospital recorded that the plaintiff was intoxicated, combative, and violent. The plaintiff asserts that he was not incapacitated by alcohol consumption on that day, and that the police had wrongfully assaulted and seized him. The defendants assert that the plaintiff was intoxicated and combative, and deny that they assaulted him.

The defendants have submitted the plaintiff's medical records for the date of the incident and two follow-up visits. They have also submitted medical records for one earlier date and three later dates which reflect treatment of the plaintiff for intoxication. After a description of the medical records, the parties' arguments regarding the admissibility of the records are addressed.

<u>THE MEDICAL RECORDS</u>

I. Records Predating the June 1, 2014 Incident

There are records reflecting that the plaintiff received treatment in a hospital on two occasions before June 1, 2014. Of those two dates, the parties have only submitted detailed records for one visit.

<u>December 14, 2013</u>

The June 1, 2014 medical records indicate that the patient was "last seen" on December 14, 2013, but the June 1 records contain no information with respect to the purpose of the December 2013 visit.  There are no separate records for treatment on December 14, 2013.

<u>May 3, 2014</u>

The plaintiff was transported by ambulance from an apartment at 247 West 122th Street to the Long Island Jewish Medical Center.  According to a New York City Fire Department ("NYFD") Emergency Medical Technicians ("EMTs") Prehospital Care Report Summary, the ambulance was dispatched after a 911 call by Ortiz's mother at 10:55 p.m.  According to the telephone log records associated with this emergency call, Ortiz's mother specifically asked for an ambulance and the police to come to the scene at least in part because he was threatening to hit her.

The ambulance arrived on the scene at 11:03 p.m.  Under the clinical notes of the Summary, the "Dispatch Reason" listed is "DRUG – Hx Drug or Alchol Abuse," and the "Chief Complaint" is "etoh abuse."  The summary notes that the "Provider Impression" is that there exists "No Medical Problem" and the "Mechanism of Injuty" is "Alcohol Intox."  The detailed notes under the

"Narrative History" indicate that the police department was also on the scene and had to help escort Ortiz to the ambulance:

> UPON ARRIVAL MALE PT FOUND AMBULATORY A&O FAMILY C/O ETOH ABUSE. FAMILY STATES PT IS VIOLENT AND HAS BEEN DRINKING. PT WOULD NOT GO WITH US. BLS AWAITED PD FOR ESCORT. PT WAS FIGHTING WITH PD AND AS WALKING DOWN STAIRS PT KEPT HITTING HEAD AGAINST WALLS. PT WAS TRANSPORTERD TO HOSP 07 WITH PD ESCORT HANDCUFFED.

The summary also notes that Ortiz had a laceration on his right eyebrow and his right elbow. The EMTs "controlled" bleeding of both injuries.

According to the telephone log record, the dispatcher noted that, after the ambulance arrived, Ortiz's mother called 911 again, stating "THAT SHE IS STILL WAITING FOR PD –- [STATES]THAT EMS WONT REMOVE THE PATIENT BECAUSE THE AIDED IS TOO AGGRESSIVE AND PD IS NEEDED."

II. Records Related to the June 1, 2014 Incident

There are three sets of records related to the June 1, 2014 incident: records of the hospitalization on June 1 and 2, and two follow-up treatments in July and August of 2014.

June 1 and 2, 2014

The medical records from St. Luke's Hospital detail the plaintiff's physical state when he was brought from 60 St.

Nicholas Avenue to St. Luke's Hospital by NYFD EMTs at 8:14 p.m.[1]

The records include a "Prehospital Care Report Summary"

completed by the FDNY EMTs on June 1. That summary includes:

> 48Y/O MALE FOUND LYING DOWN IN THE GROUND WITH PD
> HANDCUFFED. AS PER PT FOUND IN FRONT OF THE LIQUOR STORE
> AT ST NICHOLAS. PT IS INTOXICATED, HE NEEDS TO GO TO HOSP
> FOR DETOX. PT HAS ODOR OF INTOXICATING SUBSTANCE BREATHE
> [sic]. PT WAS UNSTEADY GAIT, COMBATIVE, BELLIGERENT,
> UNABLE TO OBTAIN THE VITAL SIGNS. NOTED AN ABRASION, LEFT
> EYEBROW-BLEEDING. NAUSEOUS AND VOMITING. PT DENIED ANY
> OTHER OBVIOUS INJURY. PT TXP TO HSP 20 W/O INCIDENT W/ PD.

The "initial triage" records from the hospital recorded at

10:23 p.m. indicate that the "complaint category" is "Toxic –

Poison/Substance Abuse" and the "Chief Complaint" is "Intox."

The triage notes also contain information given to the

registered nurse on duty by the EMTs: "as per EMS, patient

admitted to drinking alcohol, yelling and aggressive, hitting

well [sic]. came in handcuffed for safety, abrasion to left

eyebrow, placed in trauma room."

In a section regarding the medications given to the

patient, notes under three of the administered medicines state

that the patient was "combative, violent." Under the fourth and

final medication administered, a note signals that the patient

was "sleeping, sedated." The first two medications -- Haldol

and Benadryl -- were administered at 10:39 p.m.; the third –-

---

[1] The records indicate that the ambulance arrived at the scene at
7:47 p.m.; left the scene at 8:08 p.m.; and arrived at the
hospital at 8:14 p.m.

Ativan -- at 10:40 p.m.; and fourth -- Tetanus / Diphtheria / Pertussis (a vaccine)-- at 11:23 p.m.

The hospital records note that the "mechanism of injury" of the patient was "Alcohol Intox," and the provider's initial impression of the patient was that there was "No Medical Problem." The relevant "Complaint Code" for the patient was "Toxic – Poison / Substance Abuse," and the "Barriers to Education" are the patient's "emotional state." Notes taken by a registered nurse at 10:56 p.m. regarding a "basic assessment" of the patient include that the patient "displays an unsteady gait, [is] combative . . . arrived handcuffed by NYPD . . . abrasion to left eybrown [sic], no active bleeding . . . [patient] reports drinking heavily today." The notes further state that the patient was "sedated for safety" and was "placed on left side" for the purposes of "maintaining airway." Later notes by a doctor who assessed Ortiz state that Ortiz was "acutely agitated, curs[ed], has been drinking, required sedation."

Ortiz spent the night at the hospital. He was discharged shortly after noon on June 2. The patient's primary diagnosis is listed at 12:24 p.m. on June 2 as a fracture of the "tibial plateau." Under that diagnosis, the "external cause of injury"

is listed as "Fall, Acccidental NOS."[2]  His "additional

diagnoses" include "alcohol abuse" and "alcohol intoxication."

In discharge notes by the same doctor from 12:25 p.m., the

patient he was instructed "not to put any weight on [his] left

leg."  A cast had been placed on Ortiz's left leg, which his is

instructed to keep on and dry.  With the cast on, he will have

to use "crutches to get around."  The discharge notes also

explain that an "xray did not show any broken bones in [Ortiz's]

knee" and earlier notes by the attending radiologist, published

at 10:42 a.m., "rule[d] out tibial plateau fracture."[3]

The patient left the hospital at 12:39 p.m. on June 2 after

he was instructed on the use of crutches.  The records indicate

that he left the hospital with no residual pain ("Pain Scale:

0/10") and left by way of bus.

The patient's discharge instructions, from three different

attending physicians throughout this time at the hospital, note

that Ortiz was referred to the Addiction Institute at Roosevelt

Hospital.  Each of his discharge notes explain that the referral

is "urgent."  No records of any visit to the Addiction Institute

have been provided.  The June 1 and 2 records note in several

---

[2] "NOS" is understood to mean Not Otherwise Specified.

[3] Earlier notes from 10:28 a.m. on June 2 noted a "concern for possible fracture involving medial tibial spine and plateau."

places that the patient was last seen at that hospital on December 14, 2013, with no other information about that visit.

July 17, 2014

The medical records from July 17, 2014 concern a follow-up visit relating to injuries sustained on the evening of June 1.[4] The patient is requesting a "follow up" and "cast removal." A doctor's recommended "care plan" from this visit notes that the patient "will require 2 more weeks of healing with cast, recommend follow up in Ortho clinic." The patient is referred for a "rapid follow up" with the Orthopedics clinic.

August 7, 2014

These records are from Ortiz's follow up visit to the Orthopedics clinic. The notes indicate that Ortiz described his injury as resulting from an "assault" by "police with a night stick" and that the injury "was at end of May or beginning of June." The results of an x-ray indicate that the patient has a "healing medial tibial plateau fracture." The patient's leg cast was removed. The doctor's final assessment is of a "closed fracture of upper end of tibia" and calls for a follow up in six

_____

[4] The defendants note a discrepancy in the names for the patient used in the medical records: he is at different times listed as Hector Ortiz, Hector Garcia, and Hector Garcia-Ortiz. There are also variations in listed birth dates. The plaintiff does not argue that the records do not pertain to him.

weeks after the patient has begun physical therapy.  No records
of any physical therapy or a follow-up visit have been provided.

III. Records for Incidents After June 1, 2014

There are hospital records of three treatments after June
1, 2014 for alcohol abuse.  The records are for hospitalizations
that occurred between September 2014 and October 2015.

September 21, 2014

The St. Luke's Hospital emergency room records from
September 21, 2014 stem from a visit to the hospital "with a
chief complaint of alcohol abuse."  Ambulance records note that
the patient was picked up at "W 120 St / St Nicholas Avenue" and
taken to St. Luke's Hospital.  The EMTs arrived at the scene at
7:59 a.m. and arrived at the hospital at 8:12 a.m.  The EMTs'
Summary Report include the following "Narrative History:"

> 48 Y/O MALE FOUND LYING ON SIDE WALK SLEEPING WITH A CAN OF
> BEER BESIDE HIM.  PT POSITIVE AOB, PT IS INCONTINENT, PT
> HAS NO VISUAL INJURIES OR PBLEEDING.  NO DIFFICULTY
> BREATHING, PT IS AMBULATORY, PT IS COMBATIVE WITH CREW, PT
> WAS TRANSPORT TO H20 FOR EVALUATION.

There were no other physical ailments associated with this
visit.  The doctor at the hospital reports that the patient's
"physical exam [was] unremarkable," but that the exam was
"limited by intoxication."

The physical exam took place at 8:28 a.m.  The patient was
reassessed at 12:19 p.m. and the doctor's notes indicate that

the patient was by then "clinically sober."  The patient was
discharged shortly thereafter with the following note: "Please
stop abusing alcohol to the point where you end up in the
emergency department."

June 4, 2015

   Another set of emergency room records dated June 4, 2015
detail a visit to St. Luke's Hospital after an ambulance
collected the plaintiff by using a stretcher from a residence at
418 West 130th Street in uptown Manhattan.  The ambulance was
dispatched after a 911 call was placed at 11:20 p.m.  The EMT's
Summary Report notes that Ortiz was "unconscious" when the EMTs
first arrived.  The detailed notes state:

> UNIT ARRIVED TO APARTMENT BUILDING, WITH ENGINE COMPANY ON
> SCENE PRESENTED WITH 49 YO MALE, FOUND LYING IN 1FL LOBBY
> BY STAIR CASE.  PT WAS EASILY AROUSED BY VERBAL CALL.  UPON
> AWAKENING SPEECH IS SLURRED HE ATTEMPT [sic] TO STAND AND
> WALK AWAY WITH AN UNSTEADY DISCOORDINATED GAIT, ALMOST FALL
> [sic].  HE IS AGGRESSIVE AND HOSTILE, MAKES GESTURES THAT
> HE WILL STRICK [sic] BY FORMING FIST AND KICKS.  HE
> THREATENS PD AND AMES CREW VERBALLY AND UNCOOPERATIVE.
>
> PT WAS ASSISTED TO STRETCHER WHICH HE ATTEMPTS TO REMOVE
> STRAPS AND GET OF [sic] WHILE BEING WHEELED PLACING HIMSELF
> AND CREW AT DANGER OF INJURY.  ALL EFFORT ATTEMPTED AT
> TRYING TO KEEP HIM CALM BY SPEAKING NICELY AND REASURING
> [sic] HIM THAT HE WAS BEING HELPED.  WHICH HE SHOWS NO
> RESPONSE TO, HE REMAINS AGGRAVATED AND TRIES TO KICK CREW
> AND PD WHICH FORECFULY TRYING TO GET OFF THE STRECHER.  PD
> HAD TO RESTRAIN HIM.  AND ESCORT EMS.
>
> PT ALLOWS FOR NO ASSESSMENT DURING THE RIDE HIS HEAD
> REQUIRERS [sic] CONTINUOUS MANUAL PROTECTION OF HIS HEAD AS
> HE ATEMPTS [sic] TO HIT HIS HEAD AGAINST ANY SURFACE.  PT
> WAS TX W/O DELAY

The notes do not report any other medical issue. The
ambulance left the scene at 11:33 p.m. to take the plaintiff to
the hospital. At 6:37 a.m. the following day, at the hospital,
a doctor reported that the plaintiff was at that point
"clinically unintoxicated." He was discharged soon after.

October 10, 2015

These records reflect a hospitalization at St. Luke's
Hospital. The records indicate that the patient was transported
to the hospital by an ambulance, but there are no EMT records
included that indicate where he was picked up, the impressions
and diagnoses of the EMTs, or at what precise time he was picked
up. The hospital records note that he arrived at 1:31 a.m. A
registered nurse's "initial assessment" at 1:38 a.m. notes that,
"upon arrival," the patient "was screaming, cursing and
threatening staf[f]." The nurse's notes indicate Ortiz was
"placed in trauma room, IV established and [the patient was]
sedated." Notes by Ortiz's attending physician, taken at 1:39
a.m., note that the "patient arrived combative, restrained by
NYPD, yelling, unable to reorient patient, given sedation for
patient and staff protection, will obs[erve] and reevaluate . .
. no signs of trauma."

Later notes from a different doctor at the hospital taken
at 2:08 a.m. explain that, as the EMTs described to her, the

11

patient's emergency room visit was apparently the result of the plaintiff's mother calling the police because he "came home intoxicated and was aggressive with his mother." After being kept under observation throughout the night, Ortiz was discharged at 10:34 a.m. As part of the patient's discharge instructions, Ortiz is instructed to "follow up" with his doctor or the clinic listed in order to address his alcohol abuse.

## DISCUSSION

The defendants seek to admit the medical records to show the plaintiff's chronic alcohol abuse. They contend evidence of his alcohol abuse is relevant to the jury's evaluation not only of his conduct on June 1, 2014, when he interacted with the defendants, but also to his claim for damages, his credibility, and his ability to perceive and recall events. They assert as well that the records prior to June 1, 2014, are admissible as similar act evidence pursuant to Fed. R. Evid. 404(b) to demonstrate the plaintiff's knowledge of his dangerous conduct when intoxicated. They also contend that the entire set of records is admissible as habit evidence, to show that the plaintiff has a habit of drinking to the point that he is combative, incoherent and requires hospitalization.

The plaintiff objects to the admission of any records for dates other than June 1 and 2, 2014, and seeks exclusion through

redaction of many passages from the June 1 and 2, 2014 records. He moves to redact from the June 1 and 2 hospital records the EMT notes, the EMTs' statements to hospital personnel, observations of the plaintiff as combative, having slurred speech, and notes that the plaintiff stated that he drank heavily that day. The plaintiff also seeks to exclude passages that report the plaintiff's chief complaint as intoxication and the discharge diagnoses of alcohol abuse. Finally, the plaintiff seeks to exclude the reference at his discharge to the cause of injury as "Fall, accidental NOS."

The general principles regarding admissibility of evidence at trial are quickly stated. Evidence is relevant if it has any tendency to make a fact of consequence in determining the action "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). "[U]nless an exception applies, all relevant evidence is admissible." United States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (citation omitted).

Evidence that is relevant may be excluded if its probative value is substantially outweighed by, among other considerations: "the danger of unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. "[R]elevant evidence is always prejudicial to one side." United States v. Kaplan, 490 F.3d 110, 122 (2d Cir. 2007). So, for relevant evidence to be excluded as prejudicial, the prejudice

must be "unfair" in the sense that the evidence has some "adverse effect beyond tending to prove the fact or issue that justified its admission into evidence." Perry v. Ethan Allen, Inc., 115 F.3d 143, 151 (2d Cir. 1997) (citation omitted).

In addition, because the plaintiff will testify on his own behalf at trial, the defendants will be allowed to attack his credibility. The scope of cross examination will be governed in large part by the plaintiff's contentions at trial and the content of his direct testimony. A witness's credibility may be attacked by showing that his capacity to observe, remember, or narrate is impaired. See United States v. Robinson, 583 F.3d 1265, 1272 (10th Cir. 2009) (extensive illegal drug use) (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 607.05[1]). Accordingly, it is "within the proper scope of cross-examination to determine whether a witness was under the influence of drugs or narcotics or alcohol at the time of observation of events in dispute, or at the time the witness is testifying." United States v. DiPaolo, 804 F.2d 225, 229 (2d Cir. 1986) (citation omitted).

Moreover, hospital records and other records reflecting medical treatment may be independently admissible, if relevant, as business records or under the exception to the hearsay rules that is directly addressed to statements made for the purpose of

receiving medical treatment.  Business records are admissible as

long as a witness can testify or certification can show that

> (A) the record was made at or near the time by -- or from
> information transmitted by -- someone with knowledge;
> (B) the record was kept in the course of a regularly
> conducted activity of a business, organization, occupation,
> or calling, whether or not for profit;
> (C) making the record was a regular practice of that
> activity[.]

Fed. R. Evid. 803(6).  "Business . . . records are generally

admissible absent confrontation not because they qualify under

an exception to the hearsay rules, but because -- having been

created for the administration of an entity's affairs and not

for the purpose of establishing or proving some fact at trial --

they are not testimonial."  Melendez-Diaz v. Massachusetts, 557

U.S. 305, 324 (2009).  "The purpose of the rule is to ensure

that documents were not created for personal purposes or in

anticipation of any litigation so that the creator of the

document had no motive to falsify the record in question."

United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010).  The

Second Circuit has stated that the business records exception

"favors the admission of evidence rather than its exclusion if

it has any probative value at all."  Id. (citation omitted).

    "In all cases, the principal precondition to admission of

documents as business records pursuant to Fed. R. Evid.

803(6) is that the records have sufficient indicia of

trustworthiness to be considered reliable."  Potamkin Cadillac

Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632 (2d Cir. 1994) (citation omitted).

> To lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record. The custodian need not have personal knowledge of the actual creation of the document to lay a proper foundation.

United States v. Komasa, 767 F.3d 151, 156 (2d Cir. 2014) (citation omitted). "There is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person." Retirement Plan of UNITE HERE Nat. Retirement Fund v. Kombassan Holding A.S., 629 F.3d 282, 289 (2d Cir. 2010) (citation omitted). A business record need not be mechanically generated to be part of a 'regular practice.'" Kaiser, 609 F.3d at 575. A showing of timeliness "is essential because any trustworthy habit of making regular business records will ordinarily involve the making of the record contemporaneously." Abascal v. Fleckenstein, 820 F.3d 561, 565 (2d Cir. 2016) (citation omitted).

Other Circuit courts have held that medical records are admissible under the business records exception to the hearsay rule, provided that the offering party can meet the criteria of Rule 803(6). See, e.g., United States v. Ellis, 460 F.3d 920,

926–27 (7th Cir. 2006) (finding medical records admissible under the business records exception even when "the medical professionals in [the] case might have thought their observations would end up as evidence in a criminal prosecution, [because] the objective circumstances of th[e] case indicate that their observations and statements introduced at trial were made in nothing else but the ordinary course of business"); United States v. Hall, 419 F.3d 980, 987 (9th Cir. 2005) (hospital records); Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (5th Cir. 1991)(business records exception supports admission of hospital records when source and recorder of information are acting in the regular course of business); Manocchio v. Moran, 919 F.2d 770, 780 (1st Cir. 1990); Norton v. Colyer, 828 F.2d 384, 386 (6th Cir. 1987) (hospital records with diagnosis of drug use admitted as business records).

This interpretation is not novel. In Thomas v. Hogan, the Fourth Circuit held that the results of a blood test for intoxication conducted on the plaintiff and contained in a hospital record were admissible under the federal Shop-Book Statute, 28 U.S.C. § 1732, the predecessor to Rule 803(6). 308 F.2d 355, 360 (4th Cir. 1962). The Fourth Circuit held that the statute supplied a "presumption that diagnosis and scientific tests are properly made by qualified personnel, if the recorded information reflects usual routine of the hospital and if it is

17

the practice to record such data contemporaneously or within a reasonable time." Id. Noting that "[h]uman life will often depend on the accuracy" of hospital records, the court reasoned that it is reasonable to presume that hospital records are trustworthy. Id. at 361.

Separately, statements made for purposes of medical diagnosis and treatment are admissible as an independent exception to the prohibition against hearsay. A statement is admissible if it "(A) is made for -- and is reasonably pertinent to -- medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). Further, a "statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included." Fed. R. Evid. 803(4) Advisory Committee's Note to 1972 Proposed Rules. The statements may relate to causation if they are "reasonably relevant" to the diagnosis or treatment, but statements as to fault are not ordinarily admissible. Id. Exceptions such as this one to the hearsay rules "rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions." Michigan v. Bryant, 562 U.S. 344, 362

n.9 (2011) (listing the exception for statements for purposes of medical diagnosis or treatment).

Out of court statements heard by witnesses or contained in records may also be admitted for their truth under the present sense exception to the hearsay rules.  The present sense impression exception permits a court to admit hearsay testimony of a statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).  The exception is "derived from the belief that contemporaneous statements about observed events leave less time to forget or fabricate and, therefore, tend to be reliable."  United States v. Gonzalez, 764 F.3d 159, 169 (2d Cir. 2014).

The defendants also seek to admit the hospital records for the dates other than June 1, 2014 as evidence of similar acts or conduct.  Evidence of another act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  Where, however, the evidence is offered for relevant purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," it may be admissible. Id. at 404(b)(2).  Like any other evidence, however, the probative value of this other act evidence may not be

substantially outweighed by any unfair prejudice.  See Fed. R.
Evid. 403.  The Second Circuit has adopted an "inclusionary
approach" to the admission of other act evidence, under which
evidence "is admissible if offered for any purpose other than to
show a defendant's criminal propensity."  United States v.
Dupree, 870 F.3d 62, 76 (2d Cir. 2017) (citation omitted).  The
Second Circuit uses a four-part test to determine whether
evidence of extrinsic acts is properly admitted:

> [The Second Circuit] consider[s] whether: (1) the prior act
> evidence was offered for a proper purpose; (2) the evidence
> was relevant to a disputed issue; (3) the probative value
> of the prior act evidence substantially outweighed the
> danger of its unfair prejudice; and (4) the court
> administered an appropriate limiting instruction.

Id. (citation omitted).

In addition, there are exceptions to the general
inadmissibility of character evidence, for example, "[w]hen a
person's character or character trait is an essential element of
a charge, claim, or defense, the character or trait may also be
proved by relevant specific instances of the person's conduct."
Fed. R. Evid. 405(b).  "Rule 405, however, deals only with the
methods by which character may be proven once it has been
determined that character evidence is admissible under Rule
404(a)."  Hynes v. Coughlin, 79 F.3d 285, 293 (2d Cir. 1996).

> Of the three methods of proving character provided by the
> rule, evidence of specific instances of conduct is the most
> convincing.  At the same time it possesses the greatest
> capacity to arouse prejudice, to confuse, to surprise, and

to consume time.  Consequently the rule confines the use of
evidence of this kind to <u>cases in which character is, in
the strict sense, in issue and hence deserving of a
searching inquiry</u>.  When character is used circumstantially
and hence occupies a lesser status in the case, proof may
be only by reputation and opinion.

Fed. R. Evid. 405 Advisory Committee's Note to 1972 Proposed

Rules (emphasis supplied).

In contrast to character evidence, evidence of a person's

habitual behavior is more readily admissible.  In particular,

[e]vidence of a person's habit . . . may be admitted to
prove that on a particular occasion the person . . . acted
in accordance with the habit or routine practice.  The
court may admit this evidence regardless of whether it is
corroborated or whether there was an eyewitness.

Fed. R. Evid. 406.

The difference between character and habit evidence has

been described as follows:

The two are easily confused.  People sometimes speak
of a habit for care, a habit for promptness, or a
habit of forgetfulness.  They may say that an
individual has a bad habit of stealing or lying.
Evidence of these "habits" would be identical to the
kind of evidence that is the target of the generalized
rule against character evidence.  Character is a
generalized description of a person's disposition, or
of the disposition in respect to a general trait, such
as honesty, temperance or peacefulness, that usually
is regarded as meriting approval or disapproval.
<u>Habit</u>, in the present context, is more specific.  It
<u>denotes one's regular response to a repeated
situation</u>.  If we speak of a character for care, we
think of the person's tendency to act prudently in all
the varying situations of life -- in business, at
home, in handling automobiles and in walking across
the street.  A habit, on the other hand, is the
person's regular practice of conduct.  Thus, a person
may be in the habit of bounding down a certain

> stairway two or three steps at a time, of patronizing
> a particular pub after each day's work, or of driving
> his automobile without a seatbelt. The doing of the
> habitual act may become semi-automatic, as with a
> driver who invariably signals before changing lanes.

1 McCormick On Evid. § 195 (7th ed. 2013)(emphasis supplied).

"Much evidence is excluded simply because of failure to achieve

the status of habit. Thus, evidence of intemperate 'habits' is

generally excluded when offered as proof of drunkenness in

accident cases." Fed. R. Evid. 406 Advisory Committee's Note to

1972 Proposed Rules. Moreover, "a general habit of intemperance

tells us nothing of the witness's testimonial incapacity unless

it involves actual intoxication at the time of the event

observed or at the time of testifying." DiPaolo, 804 F.2d at

229 (emphasis in original) (citing 3A J. Wigmore, Evidence §§

933-934 (Chadbourne rev. 1970)). The Tenth Circuit similarly

observed that, because the habit of intemperance "does not

involve the veracity trait, . . . it will usually not be

admissible." Id. (citation omitted). See also Mary Ellen

Enterprises v. Camex, Inc., 68 F.3d 1065, 1073 (8th Cir. 1995)

(finding that the district court did not abuse its discretion in

excluding evidence of the plaintiff's alcoholism, because it did

not "tend to show that [she] had any difficulty understanding or

recalling events related to her dealings with [the defendant]").

The Fifth Circuit has approved exclusion of evidence of

four prior convictions for public intoxication over the course

of three and one-half years when it is "clear that the [defendant] intended for the [plaintiff's] prior convictions to show that he was intoxicated on the night of the accident." Reyes v. Missouri Pac. R. Co., 589 F.2d 791, 794 (5th Cir. 1979). On the other hand, the Eleventh Circuit approved use of anecdotal and reputation evidence of an employee's prior intoxication over the course of six years under Rule 406 to demonstrate a "uniform pattern of behavior" of carrying and consuming alcohol while on the job. Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519, 1523 (11th Cir. 1985).

While discussions of the admissibility of evidence of alcohol abuse and alcoholism have existed mainly in the context of character and habit evidence, see supra, there is reason for courts to understand alcoholism outside these bounds. Today, alcoholism is considered as much a disease as a reflection of character or habit. Courts have recognized, for example, that alcoholism and other addictions can be considered as diseases or disabilities for the purposes of the American with Disabilities Act. See, e.g., Regional Economic Community Action Program, Inc. v,. City of Middletown, 294 F.3d 35, 46 (2d Cir. 2002) ("Alcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA, the ADA, and the Rehabilitation Act."). There exist ample medical studies dedicated to the study of alcoholism as a medical illness.

Viewed in this light, expert testimony regarding a witness's addiction to alcohol or medical records pertaining to a party's alcoholism may be admissible if the presence of the addiction is relevant to the issues at trial.  For instance, in Halvorsen v. Baird, 146 F.3d 680 (9th Cir. 1998), the plaintiff disputed that he was intoxicated at the time of the events at issue.  The Ninth Circuit held that a trial judge was "within his discretion in admitting" expert testimony that relied on information that the plaintiff had been admitted to a detox facility twice in the previous two years to support the point that a "typical characteristic of alcoholics is denial that they have been drinking when they plainly have".  Id. at 686.  A court may admit evidence "of a disease which, if the jury believed the expert testimony, would cause [the plaintiff] to be mistaken in his claim of sobriety on the night at issue."  Id. In Halvorsen, the plaintiff sued the police officers who had taken him to a detox center after encountering him in response to a 911 call.  The center's records documented him as having an unsteady gait, smelling of alcohol, and unable to care for himself.  Id. at 683.

June 1 and 2, 2014

The medical records from June 1 and 2, 2014 are relevant and admissible pursuant to business records exception.  See Fed.

R. Evid. 803(6).  The records also contain statements made by
Ortiz to medical personnel for the purposes of medical diagnoses
and treatment that are separately admissible under Fed. R. Evid.
803(4), or admissible as admissions by a party opponent pursuant
to Fed. R. Evid. 801(d)(2).  Finally, many statements by EMTs
and hospital staff also reflect the contemporaneous observations
-- i.e., the present sense impressions -- of the medical team
who tended to Ortiz and are admissible as well on that ground.
See Fed. R. Evid. 803(1).  The notes in the records are
timestamped, indicating that they were jotted down during or
soon after examining and treating the patient.  The records
describe, in clear detail written by multiple medical
professionals, that Ortiz was highly intoxicated and combative
at a relevant period of time.

The June 1 and 2 records are directly relevant to the
plaintiff's claims, his credibility and his request for damages.
They describe the degree to which he suffered physical injuries
on the night of June 1.  The plaintiff's mental state is
relevant to his claims, to his ability to observe and remember
the encounter with the defendants on June 1, and to the defense
being offered to the charges of excessive force and false
imprisonment.

The records do not unfairly prejudice the plaintiff: as the
plaintiff himself has admitted, he was drinking on June 1.

These records confirm what the plaintiff himself admits and more precisely describe the degree of his intoxication, which is disputed in this case.  There is no unfair prejudice to the plaintiff from the admission of these relevant records and none of the other concerns identified in Rule 403 substantially outweigh their considerable probative value.

The plaintiff seeks to redact those portions of the June 1 and 2 records that reflect his alcohol consumption.  He makes several arguments to support those redactions.  With the limited exceptions described below, these requests do not succeed.

Ortiz first argues that, because no blood alcohol test was administered, there is no way to know how intoxicated he actually was.  Accordingly, because no objective metric was used to measure his intoxication, he contends that any references to intoxication are necessarily subjective opinion testimony.  There is no requirement in the law that the entries in medical records, which are appropriately received as business records, be limited to test results.  Indeed, it is the business of hospitals and medical providers to develop opinions or diagnoses based upon examination and to render treatment in reliance of on those diagnoses.  Nor does the plaintiff offer authority in support of his argument that intoxication may only be assessed by medical providers through blood tests.  The records reflect the impressions of multiple medical professionals that Ortiz was

intoxicated far beyond what he admits, and support those
impressions with consistent descriptions of his behavior.  The
doctors were sufficiently confident of their opinions to
prescribe medication based on that diagnosis and to refer Ortiz
at the time of discharge to an Addiction Institute for
treatment.

The plaintiff next argues that records relating to his
alcohol consumption are irrelevant to the defense being offered
at trial to one of the plaintiff's claims, the claim of false
arrest.  He contends that mere intoxication is insufficient to
justify an arrest, and that in any event, the details of his
mental and physical state while in the ambulance and at the
hospital have no bearing on his condition "at the time of his
arrest."

The defendants support their seizure of the plaintiff on
June 1 as appropriate under N.Y. Mental Hygiene Law § 22.09.
Under that law, "[a] person who appears to be incapacitated by
alcohol and/or substances to the degree that there is likelihood
to result in harm to the person or to others may be taken by . .
. a police officer . . . to a treatment facility for purposes
of receiving emergency services."   N.Y. Mental Hyg. Law §
22.09(b)(2).  A person is "incapacitated" if he or she "as a
result of the use of alcohol and/or substances, is unconscious
or has his or her judgment otherwise so impaired that he or she

is incapable of realizing and making a rational decision with respect to his or her need for treatment."  Id. § 22.09(a)(2).

While evidence that Ortiz was diagnosed with "alcohol intoxication" at the hospital was insufficient at summary judgment to establish as a matter of law that Ortiz "appeared incapacitated at the time the officers seized him," Ortiz v. City of New York, 16cv2206 (DLC), 2016 WL 7009059, at *2 (S.D.N.Y. Nov 30, 2016), that does not render the information in the hospital records irrelevant or inadmissible at trial.  While the notes contained in the records were not recorded at the precise moment of his handcuffing, a jury could nevertheless reasonably find them highly informative regarding his state at the time of the police encounter.  After all, Ortiz does not claim that he drank any more alcohol between the time of his seizure by the officers and when the ambulance personnel arrived.  Therefore, a jury could find that his state of intoxication observed by the EMTs was approximately the same, or at least no worse, than his state when the police encountered him.  The same can be said of the observations made by nurses and physicians who treated Ortiz at the hospital.  In addition, because his mental state is directly relevant to his claims, to his ability accurately to observe and remember the encounter with the defendants on June 1, and to the defendants' defense to the charges of not only false imprisonment but also excessive

force, the hospital records regarding Ortiz's intoxication are admissible.

The plaintiff seeks to redact from the EMT notes the entry for "dispatch reason", which reads, "EDP – Psychiatric Patient."[5] He argues that because the EMTs were not present during the encounter between him and the defendants, this entry should be excluded. He also seeks to redact the EMT descriptions of the chief complaint and mechanism of injury for Ortiz as "alcohol intox". The request to redact the EMT observations of Ortiz are denied. As described above, these are admissible under the business records rule and as present sense impressions. The entry regarding the "dispatch reason", however, appears to record the information given by the police as they requested an ambulance. If the plaintiff requests, the jury will be instructed that the "dispatch reason" entry, which describes Ortiz as an "EDP-Psychiatric Patient", is offered not for its truth, but only for the fact that this was the reason recorded for summoning an ambulance to the scene.

Ortiz seeks to redact the entries by the triage nurse that note that he admitted to drinking alcohol and that he was yelling, aggressive, and violent. He argues that any information she noted was given to her by the EMTs, not by the

_____

[5] EDP refers to emotionally disturbed person.

plaintiff himself: the notes say "per EMS" and, further, the nurse noted that Ortiz was "unable to answer" her questions due to his "emotional state."  Ortiz argues that the EMTs' own observations about the plaintiff's behavior are irrelevant because their observations were made after the interactions between Ortiz and the defendants that are at issue here.  As already explained, the observations by the EMTs were made sufficiently close in time to the incident at issue to be probative.  The EMTs' descriptions of any statement that Ortiz made to them is admissible as an admission by a party opponent and/or a statement made for the purpose of seeking medical treatment, and the recording of that admission and their own observations of Ortiz are admissible under the business records exception to the hearsay rules.

Ortiz argues that the notes from a nurse recording his statement that he was "drinking heavily today" are inadmissible hearsay.  Statements by Ortiz to the nurse are not hearsay.  They are admissible for their truth as admissions by a party opponent.  They are admissible as well under exceptions to the hearsay rules as statements made for the purposes of medical diagnosis and treatment, and as a patient's recorded statements in a hospital's business records.  Read in the broader context of the notes, Ortiz's admission helps to explain Ortiz's physical symptoms: an unsteady gait, combativeness, slurred

speech, and the need to sedate him.  Given that the records list
alcohol intoxication and alcohol abuse as the pertinent
diagnoses, the statements that Ortiz made that explain his level
of intoxication are highly relevant.

The plaintiff seeks to redact notes made at discharge by a
physician that indicate that the "external cause" of the
patient's leg injury was "Fall, accidental NOS."  Ortiz argues
that, because the cause of the injury is irrelevant to his
treatment or diagnosis, the statement does not fall under the
exception to hearsay for statements made for medical diagnosis
or treatment.  To the contrary, the cause of the leg injury is
pertinent to treatment given on June 1 and June 2.  It relates
directly to the physician cautioning Ortiz against alcohol
abuse.  Moreover, Ortiz's assertion that this description of the
cause did not come from the plaintiff himself seems unwarranted.
The explanation appears in the discharge records, many hours
after the EMT personnel had delivered Ortiz to the hospital, and
there is no reason to conclude that anyone but the plaintiff
could have been the source of that information.  As a statement
from the plaintiff, it is also admissible as an admission by a
party opponent.

Finally, the plaintiff seeks to redact notations in the
June 1 and 2 records that indicate that the patient was "last
seen" on December 14, 2013.  Because the medical records contain

no information with respect to the purpose of the December 2013
visit, the reference to an earlier visit invites speculation.
The notation shall be redacted.

July 17 and August 7, 2014

Doctors' notes relating to the treatment of Ortiz's leg
injury on two follow-up visits are generally admissible.  Like
the June 1 and 2 notes, this information is directly relevant to
plaintiff's claims and request for damages.  They describe the
continuing severity of physical injury suffered by the plaintiff
on the night of June 1 and how long the injury took to heal.

The parties have not yet addressed those portions of the
August 7 records in which Ortiz volunteers a description of how
his left leg injury occurred.  He blames the police for the
injury that occurred over two months earlier.  Ortiz's
statements do not appear to relate to the removal of the cast or
any other treatment he received that day.  The parties will be
given an opportunity to address the admissibility of this
portion of the August 7 records.

Records for Remaining Dates

Ortiz disputes his level of intoxication on June 1, 2014
and the effect of his intoxication on his interactions with
police on that day.  The defendants argue that, taken together,
the medical records for five occasions -- May 3, June 1 and

September 21, 2014, and June 4 and October 10, 2015[6] -- show that the plaintiff has a demonstrated history of intoxication to the point of incapacitation and aggression. They argue, therefore, that the records of the four occasions besides the date of the incident at issue in which Ortiz was treated in a hospital for intoxication are relevant and admissible.

These five occasions, which spanned a period of sixteen months, have many common elements. In every instance, an ambulance brought Ortiz from his neighborhood to a hospital[7], where he was diagnosed as intoxicated. On three occasions he was described as belligerent or aggressive and the NYPD was present at the scene. The parties will be given an opportunity to address the admission of the records for May 3 and September 21, 2014 and June 4 and October 10, 2015 in light of the legal principles outlined above. The analysis will be informed by the nature of the plaintiff's arguments and testimony at trial, as well as the defense asserted in response to Ortiz's claims.

---

[6] The defendants also seek to include references to the December 14, 2013 visit, although they include no records or information about this visit.

[7] On all occasions except May 3, 2014, he was taken to St. Luke's.

CONCLUSION

The June 1 and 2, 2014 medical records, and those records for the two follow-up treatments are largely admissible. Judgment is reserved on the admissibility of the remaining medical records.


Dated:     November 21, 2017
           New York, New York

                          _____
                                    DENISE COTE
                          United States District Judge